IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re APPLICATION OF BIOGEN MA, INC. for issuance of a subpoena under 28 U.S.C. § 1782 | No. |

**MEMORANDUM IN SUPPORT OF BIOGEN'S APPLICATION FOR ISSUANCE OF A SUBPOENA UNDER 28 U.S.C. § 1782**

PRELIMINARY STATEMENT

This is an ex parte application under 28 U.S.C. § 1782 to serve a subpoena on Sandoz Inc. ("Sandoz"). The applicant, Biogen MA, Inc., is headquartered in Cambridge, Massachusetts, and is a wholly-owned subsidiary of Biogen Inc., a global biotechnology company that has pioneered multiple breakthrough innovations including a broad portfolio of medicines to treat multiple sclerosis ("MS").[1] Biogen MA, Inc. and its affiliates (collectively, "Biogen") developed and commercialized Tysabri®, a biologic medicine used to treat certain forms of MS, whose active ingredient is the monoclonal antibody natalizumab.

BACKGROUND

A.  <u>The Development of Tysabri and Accelerated FDA Approval.</u>

Tysabri was first developed in the late 1990s. The Phase II clinical trial results were published in January 2003, when just a few treatment options, with modest effect, were available for MS. Those early results immediately suggested that Tysabri had impressive efficacy in treating MS, and Tysabri was quickly viewed as a potential major breakthrough in MS treatment. The one-year results of the Phase III trials, submitted to the FDA with Biogen's application for

---

[1] Biogen MA, Inc., the applicant here, is the owner of the patents that Biogen intends to assert in the Italian proceedings relevant to this Application.

{01906541;v1 }

approval of Tysabri, were extremely promising. As a result, the FDA considered Tysabri for accelerated approval, and in November 2004, it approved Tysabri for the treatment of certain forms of MS in the United States. (Butler Decl. ¶ 9).

B. <u>PML And John Cunningham Virus.</u>

In early 2005, two cases of progressive multifocal leukoencephalopathy ("PML"), an extremely rare neurological disorder, were reported in MS patients who were prescribed Tysabri during clinical trials. PML, while extremely rare, is usually fatal. It is caused by John Cunningham Virus, usually called "JC virus," or simply "JCV." While many people are exposed to JCV in childhood and most adults have been infected with it, in the great majority of cases, JCV is harmless. JCV is not cleared from the body and remains latent, most often in the kidneys, usually causing no symptoms. Until 2005, PML was typically found in patients with severely compromised immune systems, for instance, AIDS and organ transplant patients. These patients' severely compromised immune systems allowed JCV to reactivate and cause PML. But PML had never been associated with MS. (Butler Decl. ¶¶ 10-11).

After these reports, Biogen voluntarily suspended all trials and commercialization of Tysabri while it investigated the possible connection between Tysabri and PML and worked to develop ways to manage the risk of PML. Biogen's scientists also conducted extensive research to identify the risk factors for PML. One risk factor they identified was the presence of anti-JCV antibodies. People infected with JCV typically have antibodies to the virus, which circulate in their bloodstreams. As a result of Biogen's early work on managing PML risk, the FDA re-approved Tysabri to treat MS in the United States in June 2006, less than 18 months after the reports of PML. The European Medicines Agency also first approved Tysabri in June 2006. (Butler Decl. ¶¶ 10, 12-16).

Biogen's scientists then developed an assay to determine a patient's JCV status, known as the STRATIFY JCV assay. The STRATIFY assay detects whether anti-JCV antibodies are present and determines the amount of antibodies present. It yields a numerical value, the "JCV index value," that is provided to the patient's clinicians. Risk factors for PML identified by Biogen's scientists include the presence and amount of anti-JCV antibodies, that is, the antibodies detected with the assay and represented by the JCV index value; the duration of treatment (PML risk increases over time); and prior treatment with an immunosuppressive drug. (Butler Decl. ¶¶ 13-15).

Using the JCV index value given by the STRATIFY assay, and guidance materials provided by Biogen, clinicians could then quantify a patient's risk of PML in light of the risk factors. (Butler Decl. ¶¶ 16-17). The following table, taken from Biogen's *Physician Information and Management Guidelines for Patients With Multiple Sclerosis Receiving TYSABRI (IV & SC) Therapy*, illustrates how the risk is quantified:

Anti-JCV antibody status

Negative antibody status
0.1 / 1000 patients

Positive antibody status

| Natalizumab exposure | PML risk estimates per 1000 patients | | | | Patients with prior IS use |
|---|---|---|---|---|---|
| | Patients without prior IS use | | | | |
| | No index value | Antibody index ≤ 0.9 | Antibody index > 0.9 ≤ 1.5 | Antibody index > 1.5 | |
| 1-12 months | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 |
| 13-24 months | 0.6 | 0.1 | 0.3 | 0.9 | 0.4 |
| 25-36 months | 2 | 0.2 | 0.8 | 3 | 4 |
| 37-48 months | 4 | 0.4 | 2 | 7 | 8 |
| 49-60 months | 5 | 0.5 | 2 | 8 | 8 |
| 61-72 months | 6 | 0.6 | 3 | 10 | 6 |

IS = immunosuppressant; JCV = John Cunningham virus; PML = progressive multifocal leukoencephalopathy.
Exposure is shown up to 72 months only as data beyond 6 years of treatment are scarce.

As the table shows, a patient with a JCV index value below 0.9 has a 0.1 in 1,000 (or 1 in 10,000) probability of developing PML in the first year of treatment, but a patient with a JCV index value above 1.5 has an 8 in 1,000 probability in the fifth year. Clinicians use such information to decide whether to prescribe Tysabri for a patient and to decide whether the risks and benefits for a patient already receiving Tysabri favor switching to a different medication.

Today, tens of thousands of patients around the world are prescribed Tysabri. It is now routine for clinicians to send a blood sample to a laboratory to perform the STRATIFY JCV assay when they are considering prescribing Tysabri for a patient or when they have patients taking Tysabri. Biogen contracts with Quest Diagnostics in the United States and Unilabs in Europe to run the STRATIFY JCV assay at Biogen's cost. (Butler Decl. ¶ 14).

C. Biogen's Assay Patents.

Biogen owns several patents relating to methods of evaluating PML risk, and in particular, to anti-JCV antibody assays, which cover the use of the STRATIFY assay. (Butler Decl. ¶ 19). Of these, a European patent ("EP 792") and a divisional application pending in the European Patent Office are relevant to this application.

  1. EP 792

European Patent No. EP 3 575 792 relates to methods of evaluating a patient's risk of PML, including through conducting a JCV assay and obtaining a JCV index value. (Butler Decl. ¶¶ 20-21).[2] Claim 1 of the patent claims:

> 1. A method of evaluating a patient's risk of developing Progressive Multifocal Leukoencephalopathy (PML), the method comprising:
>
>   i) determining, in a serum or plasma sample of the patient, an anti-JC Virus (JCV) antibody titer, wherein the anti-JCV antibody titer is determined by an ELISA assay comprising the following steps:

---

[2] A true copy of EP 792 is attached as Exhibit 1 to the Butler Declaration.

(a) forming a reaction mixture comprising an aliquot of sample and a substrate on which is disposed Highly Purified Viral-Like Particles (HPVLPs), and

(b) detecting the level of anti-JCV antibody bound to said substrate on which is disposed HPVLPs;

wherein the anti-JCV antibody titer is expressed as an index value, wherein the index value is determined by normalizing an optical density (OD) value of the sample to a cut-off calibrator adjusted to have an nOD of 1, and a positive control is adjusted to have an nOD of 1.3; wherein the cut-off calibrator and positive control comprise a mixture of serum positive for anti-JCV antibodies and serum negative for anti-JCV antibodies, and wherein a negative control comprises anti-JCV antibody negative serum and has an nOD of 0.1;

and

ii) determining the patient to be at high risk of developing PML if the anti-JCV antibody index value is determined to be > 1.5.

Claim 2 of EP 792 claims:

2. The method of claim 1, wherein

the anti-JCV antibody titer is expressed as an index value for a first reaction mixture comprising a first aliquot of the serum or plasma sample of the patient and a substrate on which is disposed HPVLP; and

in a second step, a % inhibition indicative of a degree to which incubation with soluble-phase HPVLP reduces a level of unbound anti-JCV antibody that binds to HPVLP disposed on a substrate as compared to the first reaction mixture, is determined in a second reaction mixture comprising a second aliquot of the serum or plasma sample of the patient and a substrate on which is disposed HPVLP; and

determining the patient to be at high risk of developing PML if the anti-JCV antibody index value is determined to be > 1.5 and % inhibition is determined to be > 70%.

Claim 3 of EP 792 claims:

3. The method according to claim 1 or claim 2, wherein the anti-JCV antibody titer or % inhibition is determined prior to an administration of natalizumab.

Claim 4 of EP 792 claims:

4. The method according to any one of claims 1 to 3, wherein the anti-JCV antibody titer or % inhibition is determined after the patient has initiated a treatment with natalizumab.

Claim 5 of EP 792 claims:

5. The method according to any one of claims 1 to 4, further comprising:
(a) determining if the patient has received treatment with natalizumab for longer than 24 months; or
(b) determining if the patient has received a non-anti-VLA-4 immunosuppressant therapy, wherein the non-anti-VLA-4 immunosuppressant therapy is selected from mitoxantrone, methotrexate, azathioprine, cyclophosphamide, mycophenolate, anti-CD20 therapy, anti-CD11a therapy, and mycophenolate mofetil.

Claim 6 of EP 792 claims:

6. The method according to any one of claims 1 to 5, wherein the anti-JCV antibody titer or % inhibition is retested at 6 month or 12 month intervals.

Claim 7 of EP 792 claims:

7. The method according to claim 6, wherein an increase in anti-JCV antibody titer or% inhibition indicates an increase in the patient's risk of developing PML.

Claim 8 of EP 792 claims:

8. The method according to any one of claims 1 to 7, wherein the patient has multiple sclerosis.

Claim 9 of EP 792 claims:

9. The method according to any one of claims 1 to 8, wherein the patient determined to be at high risk of developing PML is determined to be at higher risk of developing PML if the patient has received natalizumab for longer than 24 months and has not previously received a non-anti-VLA-4 immunosuppressant therapy, wherein the non-antiVLA- 4 immunosuppressant therapy is selected from mitoxantrone, methotrexate, azathioprine, cyclophosphamide, mycophenolate, anti-CD20 therapy, anti-CD11a therapy, and mycophenolate mofetil.

The claims describe Biogen's method of carrying out a test for antibodies known as an enzyme-linked immunosorbent assay (ELISA), using viral proteins known as highly purified virus-like particles (HPVLPs) that resemble JCV, calculating an index value as the optical density of a patient serum/plasma sample normalized against that of a cut-off calibrator and validated with positive and negative controls of specific index values, and using that index value to identify patients at high risk of PML. Claim 2 is dependent on Claim 1 and further limits the

method of carrying out the test. Dependent claims 3 and 4 limit the method to that where the patient is being, or is to be, treated with natalizumab. Further dependent claims introduce additional limitations, e.g., where the patient has MS, where the patient is periodically re-tested, etc.

Biogen's inventions, as claimed in EP 792, effectively stratifies PML risk according to the index level of anti-JCV antibody, allowing the identification of a new sub-group of patients that can be treated with natalizumab, with a superior benefit:risk profile. Thus, using the claimed methods, more patients can receive the therapeutic benefits of natalizumab without suffering the potentially fatal side effect of PML.

3. <u>The Pending Divisional Application (Application No. EP 4 187 248).</u>

Biogen has filed a divisional application (that is, a "child" of EP 792, the "parent" patent) with the EPO. The application is still in the examination process and has not yet been published. Biogen has requested accelerated processing and expects the application will publish on May 31, 2023 alongside the EPO examiner's initial search report. (Butler Decl. ¶ 22-23). Claim 1 of the divisional application, in its current form, claims:[3]

> 1. Natalizumab for use in the treatment of multiple sclerosis in a patient, wherein the treatment comprises a method of evaluating the patient's risk of developing Progressive Multifocal Leukoencephalopathy (PML), the method comprising:
>
> > i) determining, in a serum or plasma sample of the patient, an anti-JC Virus (JCV) antibody titer, wherein the anti-JCV antibody titer is determined by an ELISA assay comprising the following steps:

---

[3] A true copy of the claims of the Application is attached as Exhibit 2 to the Butler Declaration. As is standard in patent prosecution, the EPO examiner has recently issued an initial report on the divisional application. The examiner's observations focus on points arising out of the particular form of claims of the division that in the examiner's view need to be addressed. Biogen now will have the opportunity to respond, and Biogen believes that the prospects of the divisional application leading to an issued patent are good. (Butler Decl. ¶ 23). A true copy of the examiner's report is attached as Exhibit 3 to the Butler Declaration.

> (a) forming a reaction mixture comprising an aliquot of sample and a substrate on which is disposed Highly Purified Viral-Like Particles (HPVLPs), and
>
> (b) detecting the level of anti-JCV antibody bound to said substrate on which is disposed HPVLPs;
>
> wherein the anti-JCV antibody titer is expressed as an index value, wherein the index value is determined by normalizing an optical density (OD) value of the sample to a cut-off calibrator adjusted to have an nOD of 1, and a positive control is adjusted to have an nOD of 1.3; wherein the cut-off calibrator and positive control comprise a mixture of serum positive for anti-JCV antibodies and serum negative for anti-JCV antibodies, and wherein a negative control comprises anti-JCV antibody negative serum and has an nOD of 0.1;
>
> and
>
> ii) determining the patient to be at high risk of developing PML if the anti-JCV antibody index value is determined to be > 1.5.

Because the divisional application is still being prosecuted, the scope of the claims could change during the prosecution process. But the content of the divisional application is highly similar to the disclosure in EP 792, although the claims relate to the use of the product natalizumab in circumstances where a patient's risk of developing PML is evaluated using the teaching of the patent.

D. Sandoz and Polpharma's Natalizumab Biosimilar.

In September 2019, Sandoz, a Swiss pharmaceutical company, and Polpharma, a Polish pharmaceutical company, announced that they had entered into a worldwide agreement for commercialization of a natalizumab biosimilar that Polpharma was developing. Under the terms of the agreement, Polpharma is responsible for development, manufacturing, and supply, and Sandoz is responsible for commercialization and distribution of the natalizumab biosimilar worldwide, subject to regulatory approvals.

After clinical trials, Polpharma announced in July 2022 that it had filed an application with the European Medicines Agency for marketing authorization for its natalizumab biosimilar. Applications for biosimilar approval typically take from 12 to 15 months from filing to decision. Biogen therefore anticipates that the Sandoz/Polpharma natalizumab biosimilar will be approved for use in Europe in about the third quarter of 2023. The press release that Sandoz and Polpharma issued announcing their marketing authorization application indicated that their natalizumab biosimilar would come with a "JCV test" subject to regulatory approval.

E. <u>US and UK Patent Litigation and the Need for Further Discovery</u>

Biogen has asserted patents related to the STRATIFY JCV assay against Sandoz and Polpharma in the US and United Kingdom ("UK"). In those proceedings, Sandoz and Polpharma have produced confidential information. But all such confidential information is protected and cannot be used in this Application or in any other proceedings. Given these limitations, Biogen may have insufficient information to meet the pleading standards in other jurisdictions, such as Italy, as discussed below.

In July 2022, Sandoz and Polpharma announced they had filed a Biologics License Application ("BLA") with the FDA and a corresponding application with the European Medicines Agency (EMA) for a natalizumab biosimilar. As part of the so-called "patent dance" under the Biologics Price Competition and Innovation Act ("BPCIA"), 42 U.S.C. § 262(*l*), Sandoz and Polpharma disclosed certain confidential technical information to Biogen. This information was protected under confidentiality provisions of the BPCIA, precluding, *inter alia*, use of the confidential information in other proceedings. *See* 42 U.S.C. § 262(*l*)(1).

Biogen brought a patent infringement action in September 2022 against Sandoz and Polpharma, *Biogen, Inc., et al. v. Sandoz Inc., et al.,* No. 22-1190, which is pending in this Court.

Biogen currently asserts 17 US patents. None of these patents are in the same family as EP 792. However, US Patents 11,280,794, 10,119,976, and 10,677,803 cover subject matter similar to EP 792 and relate to methods of evaluating a patient's risk of developing PML, in particular, by obtaining a JCV index value from an anti-JCV antibody assay (Butler Decl. ¶ 26).

Sandoz and Polpharma produced additional confidential information to Biogen in connection with the US patent infringement action, including both commercial and technical information. For example, in the US patent litigation, Biogen served requests for the production of documents on Sandoz on October 5, 2022, and February 8, 2023. The document requests sought, among other things, documents relating to the development of an anti-JCV antibody assay by or for Sandoz and documents relating to studies comparing STRATIFY to any other anti-JCV antibody assay. In response to these requests, Sandoz made a document production. The disclosed information, however, is covered by a protective order, and Biogen cannot use it in any other proceedings, including this proceeding. Indeed, outside counsel for Biogen on this Application and in the prospective Italian action have no access to them.

In the UK, Biogen asserted a claim for threatened infringement of the UK designation of EP 792. The trial is now scheduled for November 2023. (Butler Decl. ¶ 27).

Although Sandoz and Polpharma have provided some technical and commercial information regarding their planned JCV assay to Biogen in the course of the UK proceedings, the scope of the disclosure under UK practice is much narrower than the scope of US discovery, and in any event, the information provided by Sandoz and Polpharma in the UK is confidential and subject to an implied undertaking not to use the information for any purpose other than the UK proceedings. (Butler Decl. ¶¶ 28-29).

Biogen intends to bring infringement claims in other jurisdictions, including Italy, relating to the Sandoz/Polpharma anti-JCV antibody assays. (Butler Decl. ¶ 20; Cuonzo Decl. ¶ 7). In particular, it intends to bring proceedings in Italy (the "Italian Action") as soon as possible. (Cuonzo Decl. ¶ 13). Italy is unusual among European jurisdictions because it allows an IP owner to bring suit on a pending patent application, even before the patent is granted. (Cuonzo Decl. ¶¶ 10-12). Biogen intends to bring suit on the pending divisional application outlined above and, potentially, the parent patent, EP 792 (Cuonzo Decl. ¶ 9). Under Italian law, Biogen has to plead evidence of the infringement when it makes its initial submissions to the Italian court (Cuonzo Decl. ¶¶ 14-15). But while Biogen has good reason to believe that the Sandoz/Polpharma natalizumab biosimilar, as Sandoz and Polpharma will use it in Italy, will infringe EP 792 and the pending divisional application (Cuonzo Decl. ¶ 7), the facts Biogen has now for use in the Italian Action may not be sufficient to allow Biogen to plead its case in Italy under Italian pleading rules.

## ARGUMENT

A. <u>The Statutory Requirements of Section 1782 Are Satisfied.</u>

Section 1782 provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. … The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person….

28 U.S.C. § 1782(a). Thus, Biogen must meet three statutory requirements. The person from whom the discovery is sought must reside or be found in the district. The evidence must be "for use in a proceeding in a foreign or international tribunal." And if there is no request from the

foreign or international tribunal, the applicant must be an "interested person." All three requirements are satisfied here.

1. <u>Sandoz Resides or Is Found in Delaware.</u>

First, Sandoz Inc. resides and is found in Delaware because it is a Delaware corporation. *See In re Liverpool Ltd. P'ship,* 2021 U.S. Dist. LEXIS 161565, at *2-3 (D. Del. Aug. 26, 2021); *In re Gilead Pharmasset LLC,* 2015 U.S. Dist. LEXIS 47802, at *4-5 (D. Del. Apr. 14, 2015).

2. <u>Biogen Is an Interested Person.</u>

Second, Biogen MA, Inc., the patent owner, is a litigant in the US and UK proceedings and will be a litigant in the Italian proceedings (Cuonzo Decl. ¶ 7). Because it is a litigant, it is an interested person. *See Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 256 (2004) (litigants "are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782").

3. <u>The Italian Action Is in Reasonable Contemplation.</u>

Third, the evidence Biogen seeks is for use in Italian proceedings. To be sure, Biogen has not yet commenced proceedings in Italy. But the Supreme Court has made it clear that the foreign proceeding need not be pending or even imminent. It is enough that the proceeding is within reasonable contemplation. *See Intel,* 542 U.S. at 259.

There are relatively few cases on what "reasonable contemplation" means, but the available guidance shows that this standard is met here. On the one hand, a foreign proceeding is probably not in reasonable contemplation when all the applicant can show is that it has retained counsel and was discussing the possibility of initiating litigation, especially if a significant amount of time had passed since the applicant could have initiated litigation. *See Certain Funds, Accts. and/or Inv. Vehicles v. KPMG LLP,* 798 F.3d 113, 124 (2d Cir. 2015). There must be

"reliable indications of the likelihood that proceedings will be instituted within a reasonable time," and the applicant must have "the practical ability to inject the requested information into [the] foreign proceeding that it contemplates." *Ijk Palm LLC v. Anholt Servs. USA, Inc.,* 33 F.4th 669, 677 (2d Cir. 2022) (citations and internal quotation marks omitted). On the other hand, where the applicant has already investigated and determined that there are possible grounds to proceed with the claim, and where the applicant submitted evidence of its intent to commence the foreign proceeding, the applicant satisfies the statute's requirement. *See Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,* 747 F.3d 1262, 1270-71 (11th Cir. 2014). This Court has held that the applicant must show "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *See In re Wei,* 2018 U.S. Dist. LEXIS 182183, at *4 (D. Del. Oct. 23, 2018) (citation and internal quotation marks omitted).

  Here, Biogen is already engaged on two fronts with Sandoz and Polpharma in this global patent dispute. Biogen has brought suit in this Court, and it has brought suit in the English courts. Biogen's counsel states that it intends to bring infringement proceedings in Italy "immediately after having obtained the results of the discovery" Biogen seeks here. (Cuonzo Decl. ¶ 13). Biogen's willingness to assert that the new Sandoz/Polpharma assay infringes its patents based on its investigation of the facts is demonstrated by the US and UK infringement lawsuits. The facts Biogen seeks regarding infringement are facts that the company's Italian lawyers will find highly useful in pleading their case. There is no question that the Italian Action is at least in reasonable contemplation.

B.  The *Intel* Factors Favor the Application.

The Court should consider four factors in deciding whether to grant this application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature and character of the foreign tribunal and its receptivity to US judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome. *See Intel,* 542 U.S. at 264-65. All of these factors favor discovery or are at least neutral. None of them weighs against discovery.

1.  Sandoz Inc. Will Not Be a Party in the Italian Action.

Sandoz Inc. will not be a party to the Italian Action, nor is it expected to participate in the Action. Thus, discovery could not be obtained from Sandoz Inc. in the Italian Action, and the first *Intel* factor favors the § 1782 application.

To be sure, Sandoz Inc. is a subsidiary of Sandoz GmbH or Sandoz International GmbH (both of whom are defendants in the US proceedings), and one or both of those companies or their appropriate subsidiaries may be defendants in the Italian Action. Courts sometimes ask whether the target of the discovery application is related to a party in the foreign case on the theory that the foreign court could compel discovery from the subsidiaries of a party.[4] But that theory carries no weight in jurisdictions like Italy, which have no system of pretrial discovery that is even remotely comparable to the United States. The key question under this factor is whether the "evidence, available in the United States, may be unobtainable absent" an order under Section 1782. *See Heraeus Kulzer GmbH v. Esschem, Inc.,* 390 Fed. App'x 88, 92 (3d Cir.

---

[4] The court may not undertake that analysis where the target is a party in the foreign case. *See, e.g., In re Gilead Pharmasset LLC,* 2015 U.S. Dist. LEXIS 18720, at *6 (D. Del. 2015) (first factor weighed against discovery where target was party, without considering whether the foreign law allowed for discovery). But because Sandoz Inc. will not be a party in Italy, that approach cannot apply here.

2010) (quoting *Intel,* 542 U.S. at 264). Here, the answer to that question is plainly yes in light of the unavailability of pretrial discovery in Italian procedural law, as outlined in the declaration of Gabriel Cuonzo.

    2.   The Italian Courts Are Receptive to Judicial Assistance.

Biogen MA, Inc., the applicant, has no burden to show that the Italian courts are receptive to evidence obtained via Section 1782. Rather, the party opposing discovery has the burden to show that the Italian courts are *not* receptive to the evidence. *See In re Biomet Orthopaedics Switz. GmbH,* 742 Fed. App'x 690, 697-98 (3d Cir. 2018); *In re Chevron Corp.,* 633 F.3d 153, 163 (3d Cir. 2011). *See also Euromepa, S.A. r. R. Esmerian, Inc.,* 51 F.3d 1095, 1100 (2d Cir. 1995) (court should only consider "authoritative proof" that the foreign court would not be receptive to the evidence).

Nevertheless, several courts have held Italian courts are receptive to evidence obtained under Section 1782. *See In re Mariani,* 2020 U.S. Dist. LEXIS 67073, at *3 (S.D.N.Y. Apr. 16, 2020)*; In re Caterpillar, Inc.,* 2020 U.S. Dist. LEXIS 70913, at *31-32 (M.D. Tenn. Apr. 21, 2020); *In re Pelleschi,* 2019 U.S. Dist. LEXIS 147545 (N.D. Ohio Aug. 29, 2019). And, even if there were a question about receptivity, the Court should not substitute its judgment for the judgment of the Italian courts themselves. *See In re Eni S.p.A.,* 2021 U.S. Dist. LEXIS 52304, at *10-11 (D. Del. Mar. 19, 2021) (where parties disagreed about whether Italian courts would be receptive to evidence offered for the first time on appeal, held the respondent had failed to show the Italian courts would not be receptive). Nor is it enough for the respondent to show that the Italian courts would allow the evidence to be offered but might not give the evidence the effect the movant wants. *See Invista N. Am. S.A.R.L. v. M&G USA Corp.,* 2013 U.S. Dist. LEXIS

66476, at *14-15 (D. Del. Mar. 28, 2013) (court rejected respondent's argument that Italian court hearing patent case would find the evidence was speculative).

Biogen's Italian counsel, Gabriel Cuonzo, a practitioner with more than forty years' experience, has confirmed these precedents by noting his own personal experience of the Italian courts' receptivity to evidence gathered in the United States in biotech patent cases, a case concerning mechanical patents on road construction machines, and a case concerning alleged misappropriation of trade secrets in the production of bone cement. (Cuonzo Decl. ¶ 24). In short, there is no doubt that the Italian courts are receptive to evidence obtained via Section 1782.

      3.   <u>Biogen Is Not Seeking to Circumvent Italian Proof-gathering Restrictions.</u>

The third *Intel* factor weighs in favor of discovery unless the applicant is attempting to circumvent the foreign country's proof-gathering restrictions. *See Intel,* 542 U.S. at 244-45. The Court need not ask whether the applicant has complied with the foreign country's discovery laws, but rather "whether the applicant's motives are tainted by a surreptitious effort to bypass foreign discovery rules." *Heraeus Kulzer GmbH v. Esschem, Inc.,* 390 Fed. App'x 88, 92 (3d Cir. 2010). But even if the applicant has tainted motives, a respondent would have to do more to show circumvention, because there is no requirement under Section 1782 that the evidence to be obtained in the United States be discoverable under the foreign law. *See id.; In re Bayer AG,* 146 F.3d 188, 192-93 (3d Cir. 1998).

As Avv. Cuonzo has stated, there is no public policy or rule of law in Italy that suggests an Italian court would be offended by evidence obtained in the United States under Section 1782. Because Italy is a civil law jurisdiction, its courts are generally indifferent to the source of the evidence the parties offer. (Cuonzo Decl. ¶ 25). The third factor favors the application.

4. <u>The Proposed Subpoena Is Reasonable in Its Scope and Is Not Unduly Burdensome.</u>

The document requests included in the proposed subpoena are reasonable in their scope. Discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Here, the relevance of the documents sought is clear. Biogen seeks basic technical information about the Sandoz/Polpharma assay that will be necessary to litigate its prospective claim for infringement. Biogen also seeks documents sufficient to show where and how Sandoz and Polpharma have performed or will perform their assay in Europe.

Nor is the proposed subpoena unduly burdensome. Biogen believes that most if not all of the technical information sought here has been produced in the US case. Thus, Sandoz has already reviewed the relevant documents, made decisions about privilege and responsiveness, and prepared documents for production. The burden on Sandoz in producing technical documents is therefore significantly less than in a case where there has not already been significant document discovery.

To the extent the Respondents assert that any of the information Biogen seeks is confidential or proprietary, Biogen is willing to enter into a protective order to protect its confidentiality, including an order as similar as possible (given the differing posture of the two cases) to the protective order negotiated between the parties in the US patent infringement case pending in this Court. Moreover, Italian courts provide protection for confidential information similar to the protections provided by US courts. In Italy, briefs and documents filed by the parties are not publicly available. (Cuonzo Decl. ¶ 26). The courts routinely grant requests from

the parties to protect the confidentiality of highly sensitive documents. (Cuonzo Decl. ¶ 27). And the judge has the power to issue protective orders, to restrict access to the hearings and to documents to named individuals only, and to redact decisions to avoid disclosure of highly confidential information. (Cuonzo Decl. ¶ 29).

## CONCLUSION

For these reasons, Biogen respectfully requests that the Court grant this application and authorize Biogen to serve the proposed subpoena on Sandoz.

*Of Counsel:*

Theodore J. Folkman
(pro hac vice forthcoming)
RUBIN & RUDMAN, LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
tlydon@ashbygeddes.com

*Attorney for Biogen MA, Inc.*

Dated: May 15, 2023