IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re APPLICATION OF BIOGEN MA, INC. for issuance of a subpoena under 28 U.S.C. § 1782 | No. |

# DECLARATION OF ZOË MARIANNE BUTLER

I, Zoë Marianne Butler, a solicitor admitted to practice in England & Wales, declare as follows:

1. I am a partner at Powell Gilbert LLP, a law firm which specialises in intellectual property law with its office in London, England.

2. I submit this declaration in support of the application of Biogen MA, Inc. for an order pursuant to 28 U.S.C. § 1782 ("Section 1782") to serve subpoenas on Sandoz, Inc. to obtain limited discovery from it for use in a patent infringement action to be commenced by the Applicant against Sandoz, Inc., Polpharma, or their affiliates in Italy.

3. Together with my fellow partner, Dr Penny Gilbert, I have conduct of related proceedings on behalf of Biogen MA, Inc. against various Sandoz and Polpharma entities in the UK, which I discuss further below. I shall refer to "Biogen" generally as including Biogen MA, Inc. and the other Biogen affiliates.

4. I studied natural sciences and law at the University of Cambridge and qualified as a solicitor in 1996.

5. In 2007, I qualified as a solicitor advocate, which is the title used for a solicitor who is qualified to represent clients as an advocate in the higher courts in England and Wales.

6. Having practised as a specialist patent litigator for more than 25 years in that jurisdiction, I am very familiar with the rules of civil procedure and the conduct of patent litigation before the English courts.

7. In my practice, I appear regularly before the Patents Court, a specialist division of the High Court, as well as the appellate courts.

## BACKGROUND

8. Biogen is a world leader in biopharmaceuticals and has developed and commercialised its Tysabri® product. The active ingredient of Tysabri is the monoclonal antibody natalizumab. Tysabri is used in the treatment of certain forms of multiple sclerosis ("MS").

### History of Tysabri

9. Tysabri was developed by Biogen in the early 2000s, with the Phase II clinical trial results being published in January 2003. These early results immediately suggested impressive efficacy in treating MS, and Tysabri quickly became viewed as a potential major breakthrough in the field of MS treatment, which at the time had few treatment options with modest effect. Subsequently, in June 2004, on the basis of promising one-year results of the Phase III trials submitted by Biogen, the US Food and Drug Administration ("FDA") considered Tysabri for accelerated approval. Accordingly, in November 2004, Tysabri was approved for the treatment of certain forms of MS in the United States. At that time, an application for approval had been filed with the European Medicines Agency ("EMA"), but was still under consideration.

10. However, in February 2005, two cases of an extremely rare neurological disorder called progressive multifocal leukoencephalopathy ("PML") were reported in MS patients who had been prescribed Tysabri during clinical trials.[1] As a result, Biogen voluntarily suspended all trials and commercialisation of Tysabri whilst a possible connection was investigated.

11. PML is an extremely rare but usually fatal disorder caused by John Cunningham Virus (commonly referred to as JC virus, or simply JCV). Many people are exposed to JCV in childhood, and by adulthood a significant proportion of the population has been infected with JCV. In the vast majority of cases, JCV is harmless. However, JCV is not 'cleared' from the body and remains latent in peripheral tissues (most typically in the kidneys). At the time of the initial reports of PML in the Tysabri clinical trials, PML was most commonly associated with patients having severely compromised immune

---

[1] A third finding of PML was later established in a patient from a different patient group, who had received Tysabri and subsequently died, the patient at the time having been misdiagnosed with a malignant brain tumour.

2

systems (e.g. AIDS and organ transplant patients) which allows JCV to reactivate and cause PML, and had never before been associated with MS.

**PML investigation and risk management**

12. In light of the strong efficacy of Tysabri in treating MS, Biogen devoted considerable resources to understanding the PML connection and developing means to manage that risk. As a result of this work, Tysabri was re-approved in the US, and first approved in Europe by the EMA in June 2006, just under 18 months following the reports of PML arising during the clinical trials.

13. Through extensive research, Biogen has been able to identify risk factors for PML, has continued to research and refine the approach to managing PML risk, and today Tysabri is prescribed to tens of thousands of patients worldwide. A critical tool in that risk management is now the provision of an assay to determine a patient's JCV status.

14. More particularly, it is now routine for clinicians to take a blood sample from patients receiving Tysabri, or being considered for treatment with Tysabri, to be sent for testing using Biogen's proprietary STRATIFY JCV assay. Biogen contracts out the running of its STRATIFY JCV assay to Quest Diagnostics for patients in the United States, and Unilabs for those in Europe. This service is funded and paid for by Biogen.

15. Individuals infected with JCV will typically develop antibodies to the virus, which circulate in their blood stream. Biogen's STRATIFY assay can be used to determine whether a patient has detectable anti-JCV antibodies and, if so, the amount present. The result of the assay presented to clinicians is a simple numerical value called a "JCV index value". Patients being treated with Tysabri are periodically re-tested to monitor for changes in their JCV index value, and routinely monitored for early signs of PML to allow Tysabri treatment to be withdrawn promptly if necessary.

16. Using Biogen's STRATIFY assay and guidance materials provided by Biogen (including Biogen's *Physician Information and Management Guidelines for Patients With Multiple Sclerosis Receiving TYSABRI (IV & SC) Therapy*), clinicians can today statistically quantify a patient's risk of PML by reference to the following risk factors:

    i.  the presence, and if so amount, of anti-JCV antibodies present (i.e. JCV index value);

    ii.    the duration of treatment (PML risk increases over time, and in particular after 2 years of treatment); and

    iii.    prior treatment with an immunosuppressive drug.

17. This information is routinely used by clinicians to determine whether to start a patient on Tysabri, and, for those on Tysabri, when the risk/benefit ratio moves to favour switching a patient to a different medication.

### SANDOZ/POLPHARMA'S NATALIZUMAB BIOSIMILAR

18. In September 2019, Sandoz and Polpharma announced that they had entered into a worldwide commercialisation agreement in relation to the natalizumab biosimilar under development by Polpharma. The September 2019 press release containing this announcement is attached to this Declaration as Exhibit 1. According to the September 2019 press release, under the terms of that agreement, Polpharma will maintain responsibility for development, manufacture and supply whilst Sandoz will commercialise and distribute the natalizumab biosimilar on a worldwide basis, subject to regulatory approvals. In a press release in July 2022, announcing that marketing authorisation applications for the natalizumab biosimilar had been accepted by the FDA and EMA, Sandoz also confirmed that the natalizumab biosimilar would be accompanied by a "JCV test" subject to regulatory approval. The July 2022 press release is attached to this Declaration as Exhibit 2.

### BIOGEN'S JCV ASSAY PATENTS

19. Biogen is the proprietor of a number of patents relating to methods of evaluating PML risk and, in particular, anti-JCV antibody assays. The patents relevant to this application are described below.

**European Patent No. 3 575 792 ("EP 792")**

20. EP 792 was granted by the European Patent Office on 30 November 2022. As explained further below, Biogen has already asserted the UK designation of EP 792 against various Sandoz and Polpharma entities in the United Kingdom. I understand that Biogen intends to commence infringement proceedings in Italy in respect of this patent in the event that it can obtain the relevant information to allow such an action to be commenced. A copy of EP 792 is attached to this Declaration as Exhibit 1.

21. EP 792 relates to methods of evaluating a patient's risk of developing PML in particular through conducting a JCV assay and obtaining a JCV index value. A patient's PML risk is quantified according to the index level of anti-JCV antibody identified in the assay, allowing the identification of a new sub-group of patients that can be treated with natalizumab with a superior benefit:risk profile, therefore allowing more patients to receive the therapeutic benefits of natalizumab without enduring the potentially fatal side effect of PML.

**The pending divisional**

22. Biogen has filed a divisional application to EP 792 with the European Patent Office ("EPO") (i.e. a "child" of the EP 792 "parent" patent). This application is at an early stage of examination, and has not yet been published. However, Biogen has requested accelerated processing and this patent application is expected to publish shortly on 31 May 2023 with application number EP 4 187 248. A copy of the claims of the divisional application is attached to this Declaration as Exhibit 2. Sandoz/Polpharma are already aware of this application, and a copy of the pending claim set was provided to them on 19 April 2023 in the context of the on-going UK litigation which is discussed below.

23. The content of the divisional application is highly similar to the disclosure in EP 792, although the claims relate to the use of the product natalizumab in circumstances where a patient's risk of developing PML is evaluated using the teaching of the patent. As an application, the scope of the claims may change during prosecution, and as part of the standard prosecution process for patent applications, on 20 April 2023, Biogen received the initial search report from the examiner at the EPO[2]. A copy is attached to this Declaration as Exhibit 3, and this report is also expected to publish on the EPO public register in late May 2023. The examiner's observations focus on points arising from the particular form of claims of the divisional (referred to as purpose limited product claims) which she considers need to be addressed, and the report invites Biogen to respond. Biogen's EPO representatives will file a written response in due course, and I am informed consider the prospects of the divisional application proceeding to grant

---

[2] The examiner's search report is dated 24 April 2023, but was in fact provided to Biogen's EPO representatives on 19 April who notified Biogen on 20 April.

5

following the usual exchange of communication with the examiner during prosecution remain good.

24. I understand that Biogen intends to commence infringement proceedings in Italy in respect of this divisional application in the event that it can obtain the relevant information to allow such an action to be commenced.

## US LITIGATION

25. I understand from Choate Hall & Stewart LLP, representatives of Biogen in the US, that, in July 2022, Sandoz and Polpharma announced they had filed a Biologics License Application (BLA) with the FDA in respect of a natalizumab biosimilar. Discovery of certain commercial and technical information has been provided to Biogen in the United States, as part of the so-called 'patent dance' under the Biologics Price Competition and Innovation Act (BPCIA) and through formal discovery during suit, but that information is either protected as confidential under the BPCIA or subject to a protective order and cannot be used by Biogen to support proceedings elsewhere.

26. Biogen filed a claim for patent infringement against Sandoz and Polpharma in September 2022, initially identifying 28 patents as infringed, before narrowing to 17 patents. Biogen also filed an application for a preliminary injunction in January 2023 in respect of a sub-set of 4 patents.

27. There is no granted US patent in the same family as EP 792. However, US 11 280 794, US 10 119 976 and US 10 677 803 are granted US patents asserted by Biogen against Sandoz and Polpharma, which, although not formally related to EP 792, cover similar subject matter in that they relate to methods of evaluating a patient's risk of developing PML, in particular through obtaining a JCV index value from an anti-JCV antibody assay.

## CURRENT EUROPEAN LITIGATION

28. On 2 September 2021, various Sandoz and Polpharma entities issued proceedings before the Patents Court in the United Kingdom seeking the revocation of EP(UK) 2 676 967 ("EP 967") and a declaration of non-infringement in respect of its natalizumab biosimilar. Biogen counterclaimed for threatened infringement.[3] EP 967 related to

---

[3] The infringement being threatened, rather than in occurrence, as the natalizumab biosimilar was (and is) not yet approved and on the market.

testing natalizumab patients for anti-JCV antibodies. The UK trial relating to EP 967 was due to be heard in February 2023. However, shortly before this, in December 2022, the Technical Boards of Appeal of the EPO revoked EP 967 centrally (i.e. for all of Europe including the UK). However, the UK proceedings have not terminated as Biogen has sought, and obtained permission, to introduce a claim in relation to the UK designation of EP 792[4]. The trial has been re-listed on an expedited basis to commence in November 2023. As noted above, the existence of the pending divisional has also been raised in those proceedings and the parties are currently discussing whether it may be addressed in the existing action.

29. The present application for discovery in aid of foreign proceedings does not include the UK. Procedural tools for discovery are available under English law (there referred to as "disclosure" rather than "discovery"), and Sandoz/Polpharma have provided certain technical and commercial information to Biogen in the context of the UK proceedings relating to their planned JCV assay. The order for directions to the UK trial provides for further disclosure, which is currently due to be provided in around mid-May 2023. However, UK procedural rules and court practice provide for the protection of confidential information, and, in patent cases, it is common for the disclosing party to designate information considered sensitive as confidential. This is typically referred to as a "confidentiality club" which I understand is broadly similar to a US protective order in that it restricts the circulation and use of information designated confidential to a defined group of individuals. Much of the information already provided by Sandoz/Polpharma in the UK proceedings to date has been designated confidential and is therefore subject to a confidentiality club restricting access to the information and its use. Moreover, any information provided by way of disclosure in the UK is automatically subject to a restriction not to use the information outside of the UK proceedings (breach of which can amount to contempt of Court) unless and until it is referred to in open Court or the Court grants permission. Permission for "collateral use" of disclosed information is rare.

---

[4] For completeness, in the context of the UK litigation, Biogen is seeking to amend the UK designation of EP 792 so as to delete claim 2. Such an amendment would only have effect in the UK and not in any other country where EP 792 is in force.

30. Accordingly, whilst Biogen has obtained technical and commercial information relevant to EP 792 as part of the ongoing UK proceedings, this currently provides no assistance in relation to potential proceedings in other European jurisdictions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, true and correct.

Executed this 10th day of May 2023 in London, England.

_[signature]_

Zoë Marianne Butler